# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### September 12, 2023 Session

## KISHA DEAN TREZEVANT v. STANLEY H. TREZEVANT, III

**Appeal from the Circuit Court for Shelby County**
**No. CT-003516-13       Mary L. Wagner, Judge**

_____

**No. W2021-01153-COA-R3-CV**

_____

This is the second appeal concerning the trial court's distribution of the divorcing parties' marital property. Following a prior appeal, this matter was remanded to the trial court to, *inter alia*, value and equitably divide the assets and debts contained in the parties' marital estate. The trial court appointed a special master to complete these tasks. At the beginning of the special master's hearing, the parties entered into a stipulation agreement concerning the values of certain marital properties, including their associated debts. Upon the conclusion of the special master's hearing, the parties stipulated to the special master's findings. The trial court subsequently conducted an additional hearing and entered its own findings, which it relied upon to formulate an equitable division of the marital estate pursuant to Tennessee Code Annotated § 36-4-121(c). The husband has appealed the trial court's division of the marital estate, arguing that the court's mathematical and other errors rendered the division of the marital estate inequitable. Discerning no reversible error, we affirm the trial court's judgment as modified herein. We decline to award attorney's fees to the wife on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, Stanley H. Trezevant, III.

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, Tennessee, for the appellee, Kisha Dean Trezevant.

# OPINION

## I. Factual and Procedural History

The plaintiff, Kisha Dean Trezevant ("Wife"), filed a complaint for divorce on August 15, 2013, in the Shelby County Circuit Court ("trial court"), naming Stanley H. Trezevant, III, ("Husband") as the defendant. According to Wife, the parties had been married since September 1, 1990, and had two children together, both of whom had reached the age of majority by the time of the divorce proceedings. Wife requested that the trial court award her a divorce and equitably divide the parties' immense marital estate, in addition to awarding her alimony and attorney's fees and expenses.

As this Court noted in its Opinion following the first appeal in this matter, equitably valuing and dividing the parties' marital property has proven to be an arduous task. *See Trezevant v. Trezevant*, 568 S.W.3d 595, 603 (Tenn. Ct. App. 2018) ("*Trezevant I*"). The Court explained:

> Throughout the marriage, Husband was very successful at his work, and the parties amassed a tremendous estate. By virtue of this success, the parties enjoyed an extravagant lifestyle. The marital residence consisted of a 10,500 square foot home containing six bedrooms, nine bathrooms, and a five car garage. In addition to their principal residence in Shelby County, Tennessee, the parties also maintained several vacation homes during their marriage, including properties in the Cayman Islands, an expansive lake home, and a home in Oxford, Mississippi. The parties took expensive international trips to destinations such as France, Spain, Greece, the Cayman Islands, and Jamaica. The family also enjoyed other trips to the U.S. Open, the Grammy Awards, West Palm Beach for diamond shopping, and Miami and New York to shop for clothing. Husband and Wife were members of sporting and social clubs in Memphis. The family drove luxury vehicles such as Range Rovers, Land Rovers, Mercedes Benz convertibles, and others.
>
> The material possessions amassed by the parties are the impetus for both the protraction of the proceedings below as well as for this appeal. As stated previously, Husband is in the real estate business. He established Trezevant Enterprises, Inc., which became a real estate management, development, and maintenance company and also does construction and leasing. The marital estate included approximately 49 commercial and residential properties. The procedural history of this case is littered with volumes upon volumes of pleadings, transcripts, and exhibits designed to identify, value, and/or distribute the parties' wealth. Among other things, the sheer size of the parties' estate, the complexities involved in valuing commercial property, including international property, and what the trial

court found to be Husband's deliberate attempts to hide assets, contributed to the convoluted process of identifying, classifying, valuing, and distributing the parties' marital estate in this case.

*Id*.

Following the initial trial, as noted in *Trezevant I*, the trial court entered a final decree on March 1, 2017, granting the parties a divorce pursuant to Tennessee Code Annotated § 36-4-129. *Id*. at 604. The court valued the parties' marital estate at $44,339,611.00 and awarded property valued at $10,135,585.00 to Wife and property valued at $34,204,026.00 to Husband. *Id*. When valuing certain marital assets, the trial court did not rely on evidence presented by Husband's certified appraisers; instead, the court utilized a July 16, 2012 financial statement, created by Husband, which listed values for the property that were higher than the appraised values. *Id*. According to its order, the trial court chose to rely on the July 16, 2012 financial statement because it "was the last financial statement submitted by Husband to a bank prior to the filing of the instant divorce action" and because "Husband continued to disregard [the appraisals] with respect to the values that he presented to the bank on his final financial statement." *Id*. at 621. The trial court also awarded to Wife alimony *in solido* of $7,500,000.00 and alimony *in futuro* of $25,000.00 per month for the first six years, followed by $20,000.00 per month thereafter. *Id*. at 624. On appeal, Husband argued, *inter alia*, that the trial court erred when valuing the marital assets by heavily relying on Husband's unsigned, unsworn, and unaudited financial statement that was prepared more than four years before the time of the trial court's ruling. *Id*. at 606.

On appeal in *Trezevant I*, this Court considered whether the trial court had erred in rejecting the appraisal evidence and instead relying on the 2012 financial statement to value the parties' marital property. *Trezevant I*, 568 S.W.3d at 619. As this Court noted, "[t]he trial court rejected the more recent certified appraisals in favor of the Financial Statement with very little explanation." *Id*. at 621. The *Trezevant I* Court found it particularly problematic that the trial court had not provided its reasoning for ignoring more recent appraisals and valuing the businesses and properties based on Husband's 2012 financial statement. *Id*. at 622.

The *Trezevant I* Court ultimately affirmed the trial court's identification and classification of marital property as well as the trial court's findings and sentencing related to Husband's criminal contempt for failing to disclose an interest in certain property. *Id*. at 641. However, the *Trezevant I* Court vacated the trial court's valuation and distribution of the parties' marital property due to the trial court's failure to state a basis for its decision. *Id*. at 623. The *Trezevant I* Court also vacated the trial court's awards of alimony because the marital property distribution had been vacated. *Id*. at 624. Those issues were remanded to the trial court for further determination as well as entry of findings of fact and conclusions of law. *Id*. at 641. Upon remand, the trial court (with a different judge now

presiding) referred the issue of valuing the parties' real property and businesses to a special master. The special master was also charged with determining Husband's income.

The special master conducted a hearing spanning four days, beginning on November 15, 2019, continuing on December 11, 2019, and concluding on February 19 and 20, 2020. On the first day of the hearing, the parties entered a written "Stipulation of Values Regarding Real Estate at Issue" ("the Stipulation Agreement"), which listed forty parcels of real estate and the agreed value of each parcel, including any debt associated therewith. However, the parties did not agree concerning the value of other properties, which values remained at issue for the special master to ascertain. As a part of the Stipulation Agreement, the parties listed three properties—North West Point property, West Bay Road property, and the Kisha Condos (collectively, "the Cayman Islands Properties")—as having a combined value of $5,900,000.00 with zero debt encumbering the properties.

During the hearing, the special master heard the testimony of Husband and three certified public accountants: Alexander Ivy, James Dilley, and Sanford Blockman. The special master further considered sixty-seven exhibits introduced as evidence, including Husband's deposition. In his recommendations and findings, the special master found that the financial expert witnesses had opined that Husband's net annual business cash flow, for an approximate three- to five-year period before the parties' divorce and before payment of Husband's personal expenses, ranged from $384,000.00 to $582,000.00. The special master pointed out that Husband had received $7,075,380.00 in loans from his various businesses in the years preceding the divorce, the average of which would equate to an annual cash flow of $1,415,076.00. The special master concluded in relevant part:

> Although the transfers of money to [Husband] from his corporations or its affiliates are denominated loans, there is no evidence that they were in fact loans. There was no evidence presented to the Special Master of any promissory notes signed by [Husband], nor does [Husband] list any loans payable to the corporation or its affiliates on his list of "Accounts Payable October 31, 2019." Based on the evidence the "loans" appear to actually be distributions of equity in the corporations to [Husband].

> In paragraph 11 of Mr. Dilley's Supplemental Declaration he states: "[t]he total amount paid to or for the benefit of Stanley H. Trezevant for 2014 through 2018 is as follows:

| | |
|---|---|
| Salary | $21,19[5] |
| Dividends/distributions | - |
| Loans/advances | $3,444,919.00 |
| (Total) | $3,466,114.00 |

The sum of $3,466,114.00 divided by five years (2014-2018) equals $693,222.80. However, in his calculations Mr. Dilley seems to have overlooked the loans reflected in the tax returns that he prepared for [Husband's] various entities that are set out above.

\* \* \*

Despite [Husband's] claims to the contrary, the Special Master's opinion is that it is not possible for [Husband] to maintain such an extravagant lifestyle with the negative cash flow suggested by [Husband], Mr. Ivy and Mr. Blockman. Neither Mr. Ivy, Mr. Dilley or Mr. Blockman included the "loans to shareholders" reflected in the tax returns in calculating [Husband's] cash flow. The evidence suggests, and the Special Master's opinion is, that the cash flow from [Husband's] business is at least $693,222.80 annually for the period 2014-2018. However, based on the "loans to shareholders" from the tax returns cited above, the cash flow from [Husband's] businesses is more likely $1,415,076.00 annually for the period 2014-2018.

It is difficult for the Special Master to determine the exact current amount of [Husband's] annual income, given the fact that his closely held corporations and affiliated partnerships made enough money from 2014-2018 to make what amounts to equitable distributions to him totaling more than $7 million in 2017 and 2018. Based on the evidence, the Special Master's opinion is that [Husband's] current annual income from his businesses is at least $582,000.00. This figure is based on Mr. Ivy's opinion that the upper range of the net business cash flow from [Husband's] closely held corporations and/or his partnerships is $582,000.00.

(Internal citations omitted.) The special master accepted the stipulated values of the properties delineated in the Stipulation Agreement and assigned values to the remaining parcels of real property.

Following the special master's hearing, Husband filed objections to the special master's recommendations and findings. Subsequently, on July 1, 2020, the parties entered into an "Agreed Order Resolving Certain Issues for Final Hearing, Limiting Others, and Addressing Other Matters" ("Agreed Order"). In this Agreed Order, Husband withdrew his objections to the special master's report, and "both parties stipulate[d] to this Court's adoption of that Report in full." The parties also stipulated to the property values and debt amounts contained in the Stipulation Agreement. The parties further agreed upon the amount of Husband's temporary alimony obligation, and Wife agreed that she would not request alimony *in futuro*, transitional alimony, or rehabilitative alimony at the final hearing. In addition, the parties agreed that all properties purchased by Husband post-

divorce were his separate property, except 2108 E. Broadway ("the Broadway Property") and 177 Abbington, which would be classified as marital property.

The trial court conducted a hearing concerning the remaining issues on September 30, 2020; October 1, 2020; and October 6, 2020. Following the filing of post-trial briefs by the parties, the trial court entered its findings of fact and conclusions of law on January 5, 2021. Included in the court's findings were (1) the length of the marriage (26 years), (2) the lifestyle enjoyed by the parties (luxurious), (3) the parties' ownership of numerous business entities, and (4) the existence of forty-six pieces of real property and numerous bank accounts and vehicles within the marital estate. The court stated:

> Throughout the pendency of the divorce, appeal and remand, Husband has exercised complete dominion and control over the marital businesses and almost all of the marital estate. Based upon the proof presented, corporate separateness appears to be a complete farce. This adds to and unnecessarily complicates the identification, valuation, and division of this estate.

With regard to credibility, the trial court noted, "generally both parties have lost almost all connection with reality." However, as the trial court also explained:

> The Court finds that Wife is generally trying to tell the truth. Her version of the truth, however, is skewed based on her perception of reality. An example of this is her perception of her involvement in the marital businesses. Husband, on the other hand, will say whatever he needs to in order to get what he wants at that moment. This is regardless of whether it is supported by the truth or even previous testimony. Throughout these proceedings, Husband routinely contradicted prior testimony or assertions. He claimed repeatedly that this Court prohibited him from taking out loans. He went so far as to testify that he was under a Court Order not to develop real estate for seven years. Yet, the proof shows that he continued to buy, sell, develop, and borrow against marital and separate property. He hid assets and loans, failed to disclose assets and loans, and even allegedly "forgot" about some assets and loans (an allegation the Court does not believe). Having considered the proof in this matter and observed the demeanor of Husband when testifying, the Court finds him not to be credible.

The trial court explained that in equitably dividing the marital estate, the court would first need to identify and classify the parties' assets. Although the court noted that "issues of identification and classification were not remanded," circumstances had occurred following remand that affected the identification and classification of certain marital property. For example, the court noted that Husband had disputed the classification of 1047 June Road as marital because Wife had quitclaimed the property to him following the divorce. The court clarified, however, that Wife had done so because this marital

- 6 -

property was awarded to Husband in the initial marital property division, an award which had since been vacated. The court therefore determined the property to be marital.

With regard to the real property owned by The Shops of Milan, a marital business, the trial court found that Husband had obtained a second mortgage associated with the property during the initial appeal without Wife's consent or knowledge. The court therefore refused to classify the additional debt as marital. Respecting the real property known as Goodman Malone East, the trial court noted that the parties' had stipulated to the value of the marital interest in the property of $26,666.00 with no associated debt. The court explained that during the final hearing, Husband produced a loan statement, dated August 2018, reflecting a loan in the amount of $1,140,221.77 to Goodman Malone East LLC. The court found that Husband was "in charge" of the business and its property and clearly knew about the loan at the time he entered into the stipulation regarding zero debt. The court therefore ruled that "Husband's behavior should not be allowed to reduce the value of the marital interest in this business."

The trial court further found that the Broadway Property was purchased by Husband during the appeal "using proceeds from the sale of marital property." The court noted that this purchase was made without the knowledge or permission of Wife or the court. The parties stipulated that the property was marital and that its value was $1,011,950.00; therefore, the only issue for the court to determine was the debt associated with the property. The court found that by the time of the special master's hearing, Husband had already paid $800,000.00 for demolition and renovation costs on the property. The court also determined that Husband had sold marital property valued at $179,400.00, taken out a loan to cover the remaining purchase price of the property, and subsequently obtained additional loans for construction despite an order entered on November 7, 2018, denying his request to borrow against the marital estate.

The trial court recited that Husband had requested the inclusion of $1,829,860.00 of debt in the valuation of the Broadway Property and had asked the court to assign a negative value to the property, which he desired to retain in the property division. The court found that the loans associated with the property were taken out by 2108 E. Broadway LLC; however, no proof had been presented about this company, "its ownership, income, assets, or value." As such, the trial court refused to include the debt of this LLC in the valuation and distribution of the marital estate because the LLC itself had not been included in the marital estate.

With reference to the Cayman Islands Properties, the trial court noted that the Stipulation Agreement had established that the Cayman Islands Properties were unencumbered by debt predicated on Husband's assertion that he was unaware of any debt. However, at the conclusion of the trial court's hearing, Wife produced an affidavit from Dawn Majors, an "Articled Clerk" for a law firm in the Cayman Islands, detailing property searches performed by her firm "to provide guidance on the procedure and cost to transfer

properties in the Cayman Islands by way of a Court Order in divorce proceedings." The affidavit reflected a total of $7,250,000.00 in debt encumbering title to the Cayman Islands Properties. The trial court noted, "Husband contends in his Post Trial Brief that these debts should be included in the calculation of the marital estate." The court therefore concluded: "Based on the proof presented as to the existence of these liens and Husband's contention, the Court will include these debts in the calculation of the marital estate." On this basis, the trial court elected to maintain the Cayman Islands Properties' value at $5,900,000.00 and assign the properties a debt of $7,250,000.00. The trial court ultimately awarded the Cayman Islands Properties to Wife along with the attendant debt.

The trial court valued Trezevant Enterprises, Inc. ("TEI"), which operated as the property manager for all of Husband's companies and properties, both marital and separate, at $720,000.00. In valuing TEI, the court incorporated the earnings value method. The court explained that during trial, Mr. Dilley, Husband's accountant, had testified that from 2014 to 2018, TEI had distributed to Husband $3,600,000.00 in shareholder loans. In addition, Mr. Dilley related that the shareholder loans were actually distributions of equity to Husband but were recorded as loans specifically to avoid the "Hall Income Tax." The court thus considered the shareholder loans to be distributions of equity and valued TEI by averaging the $3,600,000.00 in distributions over the years 2014 through 2018. The trial court found that the company had an average future earnings of $720,000.00 per year based on this calculation and assigned TEI that value.

The trial court also found that in January 2020, Husband had purchased a number of properties: 680 Piper Street, 719 Piper Street, 0 N. Rowlett, and 0 Poplar Avenue, collectively referred to as the "Piper Superfund Property." The existence of this property and Husband's use of two LLCs to purchase the Piper Superfund Property had been disclosed on the last day of the special master's hearing. The court noted that despite forming two new LLCs to purchase the property and closing on the property "in the middle of the special master hearing, Husband had claimed that he simply forgot he owned" the property, a claim that the trial court found not credible.

The trial court noted that the Shelby County Property Assessor had valued the Piper Superfund Property at $2,100,000.00. By contrast, Husband testified that the Piper Superfund Property should be valued at ten dollars. Husband also testified that the property was subject to a $1,500,000.00 tax lien and $15,000,000.00 lien by the Environmental Protection Agency ("EPA"). The trial court found that the property was purchased through an LLC, of which Husband was the sole member. Because Husband purchased the property through an LLC, he testified that he was not liable for any of the debt or liens on the property and could simply give the property back if the liens could not be resolved. Husband indicated that he believed he had the EPA liens "worked out." In addition, Husband testified that by transferring the property through "the Land Bank," the property would not be subject to the tax liens. The trial court found that based upon the likelihood

that the liens would be resolved, the value of the Piper Superfund Property would be approximately $2,100,000.00.

Concerning other assets, the trial court found that on July 21, 2017, Husband had purchased a new Range Rover vehicle for the benefit of the parties' adult daughter through Trip's Nurseries, a marital business. The business purchased the Range Rover for $47,553.99, and the purchase price was the only evidence provided as to the value of the Range Rover. The trial court found the Range Rover to be an asset of Trip's Nurseries, which resulted in the inclusion of the Range Rover's value in the value of that marital business entity. Respecting debt, the court refused to include any of Husband's additional claimed debts of more than $3,000,000.00 in the marital estate.

The trial court also determined that Husband's average income was $1,400,000.00 annually. In doing so, the trial court relied on the special master's finding that Husband had received loans to shareholders from all his businesses in the total amount of $7,075,380.00 from 2014 to 2018. The trial court again noted Mr. Dilley's testimony that the shareholder loans were more accurately described as distributions of equity. The court thus found that Husband's average income was $1,400,000.00 annually.

Following its consideration of the facts in light of the factors enumerated in Tennessee Code Annotated § 36-4-121(c), the trial court ultimately awarded 58% of the marital estate to Wife and 42% to Husband. The trial court provided several reasons for this decision, including Husband's greater ability in the future to earn high income with little effort and Husband's dissipation and management of the marital estate during the pendency of the proceedings. The court also considered Husband's "repeated inability and simple refusal to abide by this Court's orders" as well as Husband's proven efforts to hide assets. The trial court awarded to Wife the following real properties: Heron Oaks Lots 1, 2, and 3; 615 W. Poplar; the Cayman Islands Properties; 1047 June Road; and Highway 72, Collierville. The trial court also awarded to Wife alimony *in solido* in the amount of $5,000,000.00 with an annual interest rate of 6%. The alimony was to be paid in $250,000.00 increments plus interest every six months until paid in full, with a requirement that husband obtain a life insurance policy, in favor of Wife, insuring the alimony amount until paid in full. The trial court found that each party was able to pay his or her own attorney's fees and expenses from awarded marital assets and thus declined to award attorney's fees to either party.

After entry of the January 2021 order, Husband filed a motion to alter or amend the judgment, attaching records purportedly demonstrating that any debt on the Cayman Islands Properties had been discharged such that no debt actually encumbered the properties. Husband also argued that the trial court should reconsider its finding concerning his income and instead adopt Mr. Ivy's income valuation of $582,000.00 or "$720,000 per year as noted in the Court's analysis of Mr. Dilley's testimony." Wife

likewise filed a motion to alter or amend, seeking clarification of the court's January 2021 order.

On September 1, 2021, the trial court entered an order concerning the parties' respective motions to alter or amend. The court denied Husband's motion in its entirety, determining that both parties had a "full and fair opportunity to put on any proof that they chose" regarding the debt on the Cayman Islands Properties. The court also noted that the parties had been allowed to file post-trial briefs and that in Husband's post-trial brief, he "expressly took the position that the debt encumbering the Cayman Islands Properties was 'now established as an uncontroverted fact in the record.'" The court determined that it was only after these properties were awarded to Wife that Husband sought to put forth "newly discovered evidence" that the debt had been paid. The court also found that the evidence propounded by Husband was not newly discovered because it was available to Husband prior to trial and should have been introduced during trial or prior to the court's ruling. The court therefore affirmed its valuation of the Cayman Islands Properties and its overall division of the marital estate. The court denied Husband's request to reconsider its findings regarding his income.

The trial court granted Wife's motion to alter or amend in part, modifying its earlier balance sheet to include parcel numbers associated with the real properties awarded to each party. The court clarified other points raised by Wife but did not modify its earlier order except for the addition of parcel numbers. The court otherwise affirmed its equitable division of the marital estate. The court denied the parties' requests for awards of attorney's fees associated with their respective motions to alter or amend. Husband timely appealed.

## II. Issues Presented

Husband presents the following issues for this Court's review, which we have restated slightly:

1.  Whether the trial court erred by ignoring the Stipulation Agreement and including in its division of the marital estate $7,250,000.00 in marital debt related to the Cayman Islands Properties.

2.  Whether the trial court erred by incorporating a mathematical error in its calculation of the net marital estate, which resulted in overvaluation of the net marital estate by $2,000,000.00.

3.  Whether the trial court erred by including in Husband's share of the net marital estate $2,145,131.00 in dissipation when such dissipation had allegedly been offset by an award of separate property to Wife prior to the first appeal in this matter and the offset of such dissipation

was purportedly affirmed by this Court in *Trezevant I*, constituting the law of the case.

4. Whether the trial court erred by incorporating a mathematical error worth $1,100,000.00 when calculating the value of Wife's separate assets.

5. Whether the trial court erred by failing to include in its valuation of Husband's separate estate more than $3,300,000.00 in separate debt.

6. Whether the trial court erred by including in its calculation of Husband's separate estate the Piper Superfund Property at a value of $2,114,700.00 when Husband testified that he purchased it for $10.00.

7. Whether the trial court erred by valuing TEI at $720,000.00, purportedly in violation of the law of the case doctrine.

8. Whether the trial court erred by failing to properly consider Tennessee Code Annotated § 36-4-121(c)(2) when finding that Husband's annual average income was $1,400,000.00.

9. Whether the trial court erred by failing to classify $1,829,860.00 in debt incurred in connection with the Broadway Property as marital debt.

10. Whether the trial court erred by including additional assets in the net marital estate that Husband had purchased after the parties were divorced.

11. Whether this matter should be remanded to the trial court to reconsider the marital property division with an instruction for the trial court to award all of the real marital properties to Husband and to award Wife an alimony *in solido* payment sufficient to equitably divide the marital estate.

Wife presents the following additional issues:

12. Whether the trial court erred by declining to award to Wife her attorney's fees and expenses.

13. Whether Wife is entitled to an award of attorney's fees on appeal.

### III. Standard of Review

Our Supreme Court has elucidated the applicable standard of appellate review in a case involving the proper distribution of assets incident to a divorce as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions related to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Furthermore, as this Court has previously held:

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an equitable division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted). *See also Manis v. Manis*, 49 S.W.3d

295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

As to our review of the trial court's decision concerning attorney's fees in a divorce action, this Court has stated:

> Our review of an award of attorney's fees is guided by the principle that "'the allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion.'" *Mimms v. Mimms*, 234 S.W.3d 634, 641 (Tenn. Ct. App. 2007) (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005)). "Reversal of the trial court's decision [regarding] attorney fees at the trial level should occur 'only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.'" *Church v. Church*, 346 S.W.3d 474, 487 (Tenn. Ct. App. 2010).

*Buntin v. Buntin*, 673 S.W.3d 593, 603 (Tenn. Ct. App. 2023) (quoting *Hernandez v. Hernandez*, No. E2012-02056-COA-R3-CV, 2013 WL 5436752, at *8 (Tenn. Ct. App. Sept. 27, 2013)).

## IV.  Equitable Division of the Marital Estate

Husband's overarching argument on appeal is that the trial court's division of the marital estate, pursuant to Tennessee Code Annotated § 36-4-121(c) (2014), was sufficiently inequitable such that this Court should vacate the trial court's ruling and remand the property division for reconsideration.  Husband points to several instances where he believes the trial court erred in valuing and dividing the marital assets.  We will address each of Husband's arguments in turn.

### 1.  Valuation of Cayman Islands Properties

Husband contends that the trial court erred by ignoring the Stipulation Agreement and including $7,250,000.00 in marital debt related to the Cayman Islands Properties when the parties had previously stipulated that such debt did not exist.  This Court has defined a stipulation as "an agreement between counsel regarding business before the court which is entered into mutually and voluntarily by the parties." *Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 701 (Tenn. Ct. App. 1999) (citing *State v. Ford*, 725 S.W.2d 689, 691 (Tenn. Crim. App. 1986); *State v. Morris*, 641 S.W.2d 883, 889 (Tenn. 1982)).  "Stipulations bind the parties and prevent them from asserting a contrary position to the stipulation, even on

appeal." *Knizley v. Knizley*, No. M2018-00490-COA-R3-CV, 2019 WL 6358208, at *2 (Tenn. Ct. App. Nov. 27, 2019) (citing *Bearman v. Camatsos*, 385 S.W.2d 91, 93 (Tenn. 1964)). This Court has further explained:

> [The stipulation's] terms must be definite and certain in order to afford a proper basis for judicial decision. . . . Factors to consider in determining whether a stipulation was entered into properly are whether the party had competent representation of counsel, whether extensive and detailed negotiations occurred, whether the party agreed to the stipulation in open court, and whether, when questioned by the judge, the party acknowledged understanding the terms and that they were fair and equitable.

*Stumpenhorst v. Blurton*, No.W2000-02977-COA-R3-CV, 2002 WL 1751380, at *4 (Tenn. Ct. App. Feb. 27, 2002) (citation omitted).

On November 15, 2019, the first day of the special master's hearing, the parties entered into the Stipulation Agreement, which listed forty parcels of real estate and the agreed value for each parcel. As a part of the Stipulation Agreement, the parties valued the Cayman Islands Properties at a collective $5,900,000.00 value with zero debt encumbering the properties. The special master valued the Cayman Islands Properties in accordance with the parties' stipulations. Although Husband initially objected to the special master's findings and recommendations, he subsequently withdrew his objections to the special master's report, and the parties stipulated to the trial court's adoption of the findings and recommendations.

During the hearing before the trial court, however, Wife produced an affidavit from Ms. Majors in the Cayman Islands, containing the results of a land register search for the Cayman Islands Properties. The land register search revealed $7,250,000.00 in debt encumbering title to the Cayman Islands Properties. By agreement of the parties, this affidavit was entered into the record as Exhibit 95. When questioned at trial regarding the contents of Exhibit 95, Husband stated that if debt existed on those properties, it would be "news to [him]." Husband testified that he had previously sold three of the Kisha Condos and believed that he had repaid any debt when those condos were sold.

Following the hearing, the trial court permitted both parties to file post-trial briefs to supplement their positions. In his post-trial brief, Husband conceded that "despite the parties' earlier stipulation that there was no debt on any of the three Cayman properties, the $7.25 million debt encumbering those properties is now established as an uncontroverted fact in the record." Husband further stated that "it has become necessary to account for that debt in the distribution of the marital estate." In her post-trial brief, Wife urged that the parties should be bound by their stipulations, pursuant to Tennessee Rule of Civil Procedure 53.04, which states that "when the parties stipulate that a master's findings of fact shall be final, only questions of law arising upon the report shall thereafter

be considered." Husband subsequently filed a reply brief, arguing that any debts reflected in the Stipulation Agreement were not encompassed by the special master's report because the special master was not tasked with evaluating the debt on the properties such that the parties' stipulations as to debt were not within the purview of Rule 53.04. Husband further argued that the parties' stipulations as to debt contained in the Stipulation Agreement should be given effect by the court "unless the stipulated facts are 'patently untrue in view of other evidence in the record,'" quoting *Mast Adver. & Publ'g v. Moyers*, 865 S.W.2d 900, 902 (Tenn. 1993). Husband thus claimed that Wife's argument regarding the debt was "utterly nonsensical" and urged the trial court to include the $7,250,000 debt in the marital estate. Husband argued that based on Wife's statement that she was "shocked and surprised" by the land records demonstrating debts associated with the Cayman Islands Properties and his testimony that he was unaware that the debts had not been released, "neither of these parties had knowledge of the $7.25 million in secured debt when they entered the Nov. 15, 2019 stipulation that there was no debt on the Cayman properties."

Interestingly, following the trial court's determination that the $7,250,000.00 debt associated with the Cayman Islands Properties would be included in the distribution of the marital estate and the court's award of those properties to Wife at a negative value, Husband filed a motion to alter or amend, arguing that he had possession of "newly discovered evidence" that the debts on the properties had been released. In other words, Husband did not seek to simply rely on the Stipulation Agreement as he now attempts to do on appeal, likely because he had already disavowed the Stipulation Agreement in his post-trial briefs. Instead, Husband attached undated "discharge" documents purportedly demonstrating that the debts associated with the Cayman Islands Properties had been cleared. Husband claimed that these documents constituted "newly-discovered evidence which was not available at the time of the trial." Despite this claim, Husband's memorandum in support of his motion stated that the debts had been paid following the sale of Kisha Condos 102 and 304, which sales the trial court had permitted by entry of consent orders in 2015.

In its order concerning Husband's motion to alter or amend, the trial court stated:

> The proof at issue regarding the debt on the Cayman Island properties was entered into evidence at trial of this matter. Both parties had a full and fair opportunity to put on any proof that they chose. At the conclusion of the proof on that same date, the parties requested and were granted sufficient time to tender Post-Trial Briefs. Husband tendered his Post-Trial Brief on November 20, 2020. Therein, Husband expressly took the position that the debt encumbering the Cayman Island properties was "now established as an uncontroverted fact in the record," and that "it has become necessary to account for that debt in the distribution of the marital estate." Only after this Honorable Court ruled that the Cayman Island properties and the accompanying debt were awarded to Wife did Husband contend that he had

"newly-discovered evidence" regarding the existence of the debt/liens in dispute. This Honorable Court rejects Husband's contention that the evidence in question qualifies as "newly-discovered evidence." Any evidence on the existence of the disputed debt or its non-existence would have been available to Husband prior to the trial of this matter. Husband could and should have tendered any such alleged evidence prior to receiving this Honorable Court's ruling. Husband did not, in hopes that the properties would be awarded to him at a negative value.

Husband has not appealed the trial court's determination that the discharge documents did not constitute newly discovered evidence.

Based on the procedural posture of this matter, we find Husband's argument regarding enforcement of the parties' Stipulation Agreement unavailing. Husband has previously asserted that the Stipulation Agreement concerning the debt on the Cayman Islands Properties should not be enforced because existence of the debt had been "established as an uncontroverted fact in the record." Husband further argued that the parties' stipulation concerning zero debt had been shown to be "patently untrue in view of other evidence in the record." As such, Husband clearly abandoned his reliance on the Stipulation Agreement during the trial court proceedings and cannot maintain an inconsistent position on appeal. *See Estate of Schultz v. Munford, Inc*., 650 S.W.2d 37, 40 (Tenn. Ct. App. 1982) (holding that a party "cannot take a position on appeal inconsistent with that taken in the trial of the case."); *Price v. Tenn. Prod. & Chem. Corp*., 385 S.W.2d 301, 307 (Tenn. Ct. App. 1964) ("When a cause is brought up for appellate review, a party cannot assume an attitude inconsistent with, or different from, that taken by him at the trial."); *Bradley Cnty. v. City of Cleveland*, No. E2012-00634-COA-R3-CV, 2012 WL 5333555, at *8 (Tenn. Ct. App. Oct. 30, 2012) ("A party is not allowed to take one position in the trial court and then take a contrary position on appeal.").

Upon the trial court's determination that Husband had abandoned his reliance on the Stipulation Agreement concerning this issue, the value of the Cayman Islands Properties and any debt associated therewith became a question of fact for the trial court to determine. *See Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998) (explaining that "valuation of a marital asset is a question of fact" to be determined by considering all relevant evidence). When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997). Accordingly, such decisions are entitled to great weight on appeal and will not be second-guessed unless they are not supported by a preponderance of the evidence. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003); *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987).

Based on the evidence in the record regarding the debt encumbering the Cayman Islands Properties, the trial court properly included the $7,250,000.00 debt in the marital estate. The valuation of this real property was within the range of the evidence introduced, and the evidence does not preponderate against the trial court's decision. We therefore affirm the trial court's inclusion of this debt in the marital estate.

2. Omission of Debt Relating to Cayman Islands Properties

The parties agree that when the trial court was constructing the court's marital property balance sheet, attached as Exhibit A to the trial court's order, the trial court made either a mathematical or typographical error concerning the value of the Kisha Condos (one of the Cayman Islands Properties) by determining the net equity of the property to be negative $2,400,000.00. However, the court found the fair market value of the property to be $1,900,000.00 with a debt owed on the property of $6,300,000.00. As such, the net equity value of the Kisha Condos should have been negative $4,400,000.00, a difference of $2,000,000.00. The evidence in the record supports the trial court's findings concerning fair market value and debt for the Kisha Condos, but we agree with the parties that the appropriate net equity for the Kisha Condos would be negative $4,400,000.00.

The effect of the trial court's error in undervaluing the Kisha Condos debt, when carried through the balance sheet, is that the court's finding as to the value of the parties' net marital estate, $13,995,484.11, was inflated by $2,000,000.00 such that the value of the net marital estate should have been $11,995,484.11. In order to discern the overall effect on the division of marital assets and debts, however, we must also determine the effect of the error concerning the distributions received by the parties.

The trial court valued Wife's portion of the marital estate at $8,080,468.97; however, this value failed to include an additional $2,000,000.00 in debt associated with the Kisha Condos. If the error in the value of the Kisha Condos were corrected, however, Wife would actually receive a portion of the net marital estate valued as follows:

| Asset | Fair Market Value | Debt | Net Value |
|---|---|---|---|
| Heron Oaks | $633,000 | 0 | $633,000 |
| 615 W. Poplar | $820,000 | 0 | $820,000 |
| Northwest Point | $2,000,000 | ($950,000) | $1,050,000 |
| West Bay | $2,000,000 | 0 | $2,000,000 |
| Kisha Condos | $1,900,000 | ($6,300,000) | ($4,400,000) |
| 1047 June Rd | $115,000 | 0 | $115,000 |
| Highway 72 | $300,000 | 0 | $300,000 |
| Funds in possession | $837,383.90 | 0 | $837,383.90 |
| Seven Mile Account | $183,350.12 | 0 | $183,350.12 |
| Alimony in solido | $5,000,000 | 0 | $5,000,000 |

| Other Debts Assessed to Wife | | ($458,265.05) | ($458,265.05) |
|---|---|---|---|
| Wife's Distribution | $13,788,734.02 | ($7,708,265.05) | **$6,080,468.97** |

Therefore, if the total value of the parties' net marital estate were actually $11,995,484.11, Wife's portion of $6,080,468.97 would constitute approximately 50.68% of the total net marital estate.

The trial court stated in its order that it intended for Wife to receive 58% of the net marital estate. Accordingly, by virtue of this error, Wife has received less than the trial court intended for her to receive. In her appellate brief, however, Wife has acknowledged the effect of this $2,000,000.00 error and has sought no relief therefor, urging that the trial court's property division should be affirmed. Because Wife has waived this issue on appeal, we will accordingly decline to adjust the trial court's calculations.

### 3. Husband's Dissipation

In *Trezevant I*, this Court affirmed the trial court's finding that "Husband dissipated [] more than $2 million dollars that he transferred to Norman Klein during the divorce proceedings." *See* 568 S.W.3d at 618. In the initial division of marital property, which was appealed in *Trezevant I*, the trial court determined that Wife's half of the total dissipation amount would be used to "offset" the assets determined to constitute Wife's separate estate. However, the *Trezevant I* Court vacated "the trial court's valuation and distribution of the parties' marital property," directing that on remand, the trial court should "articulate detailed findings of fact and conclusions of law regarding the analysis it employs to value and distribute the marital estate." *Id.* at 624.

Following remand, as previously explained, the trial court utilized a special master to determine asset values and Husband's income stream. The trial court then conducted its own hearing regarding the financial issues. In its resultant order, the trial court fulfilled its assigned tasks, stating detailed findings of fact and conclusions of law concerning its valuation methods, the facts and factors considered regarding an equitable distribution, and other necessary issues. In doing so, the trial court considered the amount of Husband's dissipation ($2,145,131.00) as affirmed by this Court in *Trezevant I*, but chose to allocate the dissipation as a marital asset awarded to Husband in its overall distribution of the parties' marital estate.

Husband argues that the trial court's decision to distribute the dissipation to him as a marital asset violates the law of the case doctrine. As this Court has previously explained concerning the law of the case doctrine:

> This doctrine is a longstanding rule of judicial practice, rather than a constitutional mandate or limit on the power of the courts. *Memphis Publ'g*

*Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998); *Orlando Residence, Ltd. v. Nashville Lodging Co.*, 213 S.W.3d 855, 861 (Tenn. Ct. App. 2006). It is based on the commonsense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited, *Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 90 (Tenn. Ct. App. 1996), and its purposes are to promote finality and efficiency in litigation, to ensure consistent results in the same litigation, and to assure that lower courts follow appellate decisions. *State v. Jefferson*, 31 S.W.3d 558, 561 (Tenn. 2000); *Harrison v. Laursen*, 128 S.W.3d 204, 208 (Tenn. Ct. App. 2003).

When the law of the case doctrine applies, the ruling of an appellate court becomes the law of the case and is binding in later trials and appeals of the same case if the facts in the second trial are substantially the same as the facts in the first trial or appeal. *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d at 306; *State ex rel. Sizemore v. United Physicians Ins. Risk Retention Group*, 56 S.W.3d 557, 566 (Tenn. Ct. App. 2001). While the doctrine applies to issues that were actually decided by the appellate court and to issues that were necessarily decided by implication, it does not apply to dicta. *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d at 306; *Ladd v. Honda Motor Co.*, 939 S.W.2d at 90.

*Sudberry v. Royal & Sun Alliance*, 344 S.W.3d 904, 909-10 (Tenn. Ct. App. 2008).

Husband does not challenge the trial court's use of the dissipation amount affirmed by this Court in *Trezevant I*; rather, he challenges the trial court's decision to include the dissipation amount as a marital asset and credit it to Husband in the division of the marital estate. Husband argues that in *Trezevant I*, this Court affirmed the trial court's ruling concerning dissipation such that any departure from the manner in which the trial court originally managed the dissipation would violate the law of the case doctrine. This argument is not compelling.

The *Trezevant I* Court affirmed the trial court's finding that Husband had dissipated marital assets worth $2,145,131.00. *See* 568 S.W.3d at 618. However, the *Trezevant I* Court also vacated the trial court's distribution of the parties' marital estate and remanded for further hearing and determination by the trial court. As such, the trial court was free to reconsider the distribution of the dissipation amount inasmuch as the *Trezevant I* Court affirmed the finding of the amount of dissipation but vacated the trial court's overall distribution of property. Ergo, the trial court abided by the law of the case doctrine by not relitigating the finding that Husband had dissipated marital funds or the amount of such dissipation; rather, the trial court only addressed the manner in which the dissipation was distributed as a part of the overall distribution of marital property. Appellate courts

reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence." *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001). Discerning that neither such condition is met in this case, we affirm the trial court's distribution of the dissipation as a marital asset credited to Husband.

### 4. Mathematical Error Concerning Wife's Separate Estate

The trial court found Wife to have the following assets in her separate estate: four bank accounts with a total value of $749,244.96; four vehicles valued at a total of $195,000.00; a silver collection valued at $3,500.00; household furnishings valued at $55,000.00; jewelry valued at $35,000.00; clothing valued at $30,000.00; 601 N. Ft. Lauderdale Beach Boulevard property with equity of $565,376.85; and 1607 Bernini Place property with equity of $945,000.00. Thus, the total value of Wife's separate estate should have been $2,578,112.81. However, on the trial court's balance sheet, the court listed a value for Wife's total separate estate in the amount of $1,510,376.85. In so doing, it appears that the court only included the values of the two real properties listed and failed to include the values of the other personalty and bank accounts in the calculation.

Husband contends that the trial court's error concerning the total value of Wife's separate estate resulted in an inequitable division of the marital estate. As Husband points out, the version of Tennessee Code Annotated § 36-4-121(c) (2014) in effect when the instant action was filed enumerated eleven relevant factors that the court should consider in making an equitable division of marital property, including "the value of the separate property of each party."[1] Tenn. Code Ann. § 36-4-121(c)(6). Husband also relies on prior opinions of this Court in support of his argument that the case should be remanded to obtain a more equitable division, including *Ellis v. Ellis*, No. E2020-00869-COA-R3-CV, 2022 WL 3724768 (Tenn. Ct. App. Aug. 29, 2022), and *Dover v. Dover*, E2019-01891-COA-R3-CV, 2020 WL 7224368 (Tenn. Ct. App. Dec. 8, 2020). Having fully considered Husband's arguments and cited authority, however, we disagree with his contention that remand is necessary.

In *Ellis*, this Court ultimately concluded that two of the assets that the trial court had classified as marital were not marital assets. *See* 2022 WL 3724768, at *8-9. The *Ellis* Court stated that because of this misclassification, "the size of the marital estate has changed by a significant amount." *Id*. at *8. The *Ellis* Court therefore vacated the marital

---

[1] Tennessee Code Annotated § 36-4-121(c) has since been amended to add a factor related to valuing a closely held business or similar asset, *see* 2017 Tenn. Pub. Acts, Ch. 309, § 1 (H.B. 348), eff. July 1, 2017, and a factor related to attorney's fees and expenses paid by each party, *see* 2022 Tenn. Pub. Acts, Ch. 762, § 6 (S.B. 2385), eff. Mar. 31, 2022. Because the complaint in this case was filed prior to the effective date of the amendments, the added subdivisions are not applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

property distribution and remanded for the trial court to "reconsider the distribution of the marital estate in light of this modification." *Id.* Similarly, in *Dover*, this Court concluded that certain of the parties' assets had been improperly classified. *See* 2020 WL 7224368, at *10-12. As a result, the *Dover* Court stated:

> Here, several assets of substantial value have changed classification on appeal, and such significant changes to "the marital estate may change the manner in which the trial court would choose to divide the rest of the parties' assets and debts." *Hayes* [*v. Hayes*], [No. W2010-02015-COA-R3-CV,] 2012 WL 4936282, at *13 [(Tenn. Ct. App. Oct. 18, 2012)]. Accordingly, we deem it prudent to remand the case to the trial court for reconsideration of its equitable division of the marital estate. *Id.*

*Id.* at *12.

These cases both involved instances when the trial court had improperly classified assets, thus mandating remand for reconsideration of the trial court's distribution of the marital estate due to a significant change in the value of the marital estate. Such is not the case here. The trial court in this matter instead made a mathematical or typographical error when totaling Wife's separate estate despite having all of Wife's separate assets correctly classified, listed, and valued. As such, *Dover* and *Ellis* are inapposite.

Moreover, the fact that the trial court recorded a potential typographical or mathematical error in its balance sheet does not convince this Court that the trial court failed to consider the entirety of Wife's separate estate in evaluating Tennessee Code Annotated § 36-4-121(c)(6), given the trial court's clear acknowledgement of the substantial size of Wife's separate estate in its January 2021 order. In addition, the trial court expressly delineated and valued each of Wife's separate assets in the court's balance sheet. We therefore determine Husband's contention that the trial court failed to properly consider the value of Wife's separate estate to be unavailing.

### 5. Consideration of Debt in Husband's Separate Estate

Husband posits that the trial court erred by failing to include in his separate estate approximately $3,300,000.00 in debt encumbering three marital properties: Goodman Malone East, the Broadway Property, and The Shops of Milan. Husband initially requested that these debts be classified as marital by the trial court. However, because the trial court declined to classify these debts as marital, Husband now urges that the trial court erred by also declining to include these debts in Husband's separate estate.

Husband postulates that the trial court's failure to include the $3,300,000.00 in debt as a part of his separate estate resulted in an inequitable division of the marital estate because the parties' respective separate estates are one of the factors a court considers when

making its equitable division of the marital estate pursuant to Tennessee Code Annotated § 36-4-121(c). In dividing a marital estate, a trial court is afforded the authority to "[e]quitably divide, distribute, or assign the marital property between the parties without regard to marital fault in proportions as the court deems just based on the factors set forth in subsection (c)." Tenn. Code Ann. § 36-4-121(a)(1) (2014). Section § 36-4-121(c)(6) provides that one factor a court may consider in making its equitable distribution of the marital estate is the "value of the separate property of each party." In addition, courts may consider "[s]uch other factors as are necessary to consider the equities between the parties." Tenn. Code Ann. § 36-4-121(c)(11) (2014).

Husband reiterates his contention that when a significant error is made in valuing a party's separate estate, this Court should vacate the trial court's property division and remand for reconsideration. Husband again relies on *Ellis*, 2022 WL 3724768 at *6-8, in support of his position. Having found Husband's reliance on *Ellis* to be misplaced, however, we need only address whether the trial court improperly weighed the value of Husband's separate estate in its analysis of the Tennessee Code Annotated § 36-4-121(c) factors when fashioning its equitable division of marital property.

There can be no question that the trial court knew about and considered these debts when rendering its equitable division. The trial court, in its January 2021 order, discussed each of these debts in detail. Relative to the additional financing obtained by Husband concerning The Shops of Milan, the court noted that Husband did so without Wife's "consent, permission, or even knowledge." Respecting the debt related to Goodman Malone East, the court found that although Husband had stipulated before the special master that the asset had no debt, he then introduced a loan statement dated August 2018 during the final trial. The court thus found that Husband knew about the loan at the time he stipulated there was no debt. In addition, the court found that the debt was not in either party's name; rather, the debt was in the name of an LLC for which Husband owned a 33% interest.

Concerning the Broadway Property, the trial court found that Husband had incurred debt related to the property despite a November 2018 court order denying his request to do so. The court also found that the debt was incurred in the name of an LLC, for which no proof had been presented of ownership. The trial court's findings concerning each of these three properties specifically acknowledged these debts and concluded that Husband's behavior "should not be allowed to reduce the value of the marital interest."

For these reasons, we determine Husband's argument concerning these debts to be unavailing. The trial court's findings demonstrate a clear acknowledgement of these debts despite the trial court's declination to include them in its valuation of the parties' separate or marital properties. Moreover, although the value of the parties' respective separate estates is one of many factors to be considered pursuant to Tennessee Code Annotated § 36-4-121(c), we determine that the trial court herein properly considered this factor.

Following our thorough review of the appellate record, we conclude that the trial court's consideration of this factor was supported by a preponderance of the evidence presented.

### 6. Valuation of Piper Superfund Property

Husband contends that the trial court erred in valuing the Piper Superfund Property at $2,114,700.00 when including it in his separate estate. As this Court has previously elucidated regarding valuation of property pursuant to divorce proceedings:

> The parties themselves must come forward with competent valuation evidence. *Kinard v. Kinard,* 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998); *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence. *See Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997); *Brock v. Brock*, 941 S.W.2d 896, 902 (Tenn. Ct. App. 1996).

*Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007). Furthermore, when a trial court has evaluated witnesses, "especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

The trial court found, *inter alia*, the following facts in support of its $2,114,700.00 valuation of the Piper Superfund Property:

> Husband purchased this property in January 2020. Husband purchased four or five parcels which the Court will collectively refer to as the "Piper Superfund." . . . Despite forming two new LLC's to purchase this property and closing on the property which Husband claims has over $16 million in liens, in the middle of the Special Master hearing, Husband claims that he simply forgot he owned the Piper Superfund. This is simply not credible.
>
> Husband's counsel told the Special Master that the property was valued at $10. Husband maintained this position through his testimony at the trial of this matter. The Shelby County property assessor has valued these parcels at over $2.1 million. Husband is currently operating a mini storage on this property. Another seemingly important fact that Husband failed to disclose.
>
> Husband asserts that this property has $1.5 million in tax liens and another $15 million in liens from the EPA. Husband during his testimony

- 23 -

explained the process in which the property could be transferred through the Land Bank and therefore would not be subject to the tax liens. Additionally, Husband testified that he thought he had the EPA liens "worked out." Further, as he admitted, if the EPA liens cannot be resolved, he can simply give the land back and he will not be liable. Finally, the property is held by an LLC in which Husband is the sole member. The LLC, and not Husband, would be liable for any debts or liens.

Having considered the trial court's credibility findings as to Husband and the evidence concerning this issue, we determine that the evidence does not preponderate against the trial court's finding of value. The trial court's value was within the range of value evidence presented. *See Owens*, 241 S.W.3d at 486. As such, we affirm the trial court's finding that the Piper Superfund Property has a value of $2,114,700.00.

## 7. Valuation of TEI

Husband asserts that the trial court violated the law of the case doctrine by valuing TEI at $720,000.00 despite the initial trial court finding before the first appeal assigning the company no value. As the trial court found on remand, TEI holds no real property itself; instead, it operates as the property manager for Husband's various companies and properties. Husband argues that the trial court erred by assigning a $720,000.00 value to TEI when no value was assigned to it following the first trial and the issue was not appealed in *Trezevant I*. Husband postulates that the zero value of TEI has become the law of the case.

We reiterate our previous articulation of the law of the case doctrine:

> When the law of the case doctrine applies, the ruling of an appellate court becomes the law of the case and is binding in later trials and appeals of the same case if the facts in the second trial are substantially the same as the facts in the first trial or appeal.

*Sudberry*, 344 S.W.3d at 910.

Notably, this Court expressly stated in *Trezevant I*: "We therefore vacate the trial court's valuation of the parties' marital property." *See* 568 S.W.3d at 623. TEI was classified as marital property; therefore, it was included in the *Trezevant I* Court's ruling of vacatur. As such, the trial court on remand was in no way bound to value TEI at zero dollars by the law of the case doctrine.

- 24 -

The trial court chose to use the earnings value method to value TEI.[2]  In doing so, the trial court considered the testimony of Husband's accountant, Mr. Dilley, who stated that TEI had paid Husband $3,600,000.00 in loans to shareholders from 2014 to 2018. According to Mr. Dilley, these shareholder loans were more accurately described as distributions of equity, but the loans were recorded as shareholder loans to avoid the Hall Income Tax.  These distributions of equity averaged $720,000.00 a year, which formed the basis for the trial court's determination pursuant to the earnings value method.

We also reiterate that when valuation evidence is conflicting, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence.  *Watters*, 959 S.W.2d at 589 (Tenn. Ct. App. 1997).  Moreover, decisions regarding the value of marital property are questions of fact. *Kinard*, 986 S.W.2d at 231.  Accordingly, valuations are entitled to great weight on appeal unless they are not supported by a preponderance of the evidence.  *Tate*, 138 S.W.3d at 875.

We affirm the trial court's finding that TEI has a value of $720,000.00, based on the earnings value method, as within the range of values represented by the relevant valuation evidence and supported by a preponderance of the evidence.  Husband's argument concerning the law of the case doctrine as it relates to the trial court's valuation of TEI is unavailing.

### 8.  Husband's Annual Income

Husband asserts that the trial court erred by determining his annual average income to be $1,400.000.00.  Considering the evidence presented, we note that Mr. Ivy testified before the special master on November 15, 2019, stating that Husband's net business cash flow for the years 2015 through 2018 ranged from $444,000.00 to $582,000.00 before taxes and budgeted personal expenses.  It was also Mr. Ivy's opinion that after deducting federal income tax and personal expenses, Husband's net cash flow ranged from negative $1,000.00 to negative $215,180.00 annually.  However, Mr. Ivy also expressed that he did not consider the $3,000,000.00 in loans Husband received from different general partnerships when calculating Husband's cash flow.  Mr. Ivy explained that he made this determination because the Internal Revenue Code does not consider loans to be income. Mr. Dilley's testimony supported that of Mr. Ivy concerning the amount of the loans,

---

[2] Our Supreme Court has recognized the earnings value method as an acceptable method of valuing a closely held corporation, as outlined in *Blasingame v. Am. Materials, Inc.*, 654 S.W. 2d 659, 666 (Tenn. 1983). We note that a portion of the *Blasingame* decision was subsequently superseded by the enactment of Tennessee Code Annotated § 47-8-102 (1992) concerning the definition of a "security" and that another portion has been overruled by *Athlon Sports Commc'ns, Inc. v. Duggan*, 549 S.W.3d 107, 125 (Tenn. 2018), concerning *Blasingame*'s perceived requirement of use of the Delaware Block method when valuing a dissenting shareholder's stock.  Neither of these subsequent developments impact the validity of the trial court's use of the earnings value method in this case.

clarifying that the shareholder loans were actually distributions of equity to Husband but were recorded as loans specifically to avoid the Hall Income Tax.

The special master was not convinced, finding: "Based on the evidence the 'loans' appear to actually be distributions of equity in the corporations to [Husband]." The special master pointed out that the tax returns presented at the hearing demonstrated that Husband had received $7,075,380.00 in loans from general partnerships, which would then average, over five years, to $1,415,076.00 in annual cash flow. The special master concluded:

> The evidence suggests, and the Special Master's opinion is, that the cash flow from [Husband's] business is at least $693,222.80 annually for the period 2014-2018. However, based on the "loans to shareholders" from the tax returns cited above, the cash flow from [Husband's] businesses is more likely $1,415,076.00 annually for the period 2014-2018.

When evaluating the evidence in light of the factors contained in Tennessee Code Annotated § 36-4-121(c), the trial court considered Husband's earning capacity as it related to the second factor, "age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties." In considering this factor, the court specifically found:

> Husband has substantial income. Here, the proof, through the testimony of Husband's accountant, Mr. James Dilley, showed that [TEI] paid Husband $3.6 million in loans to shareholders from 2014-2018. Or on average $720,000 a year. These loans to shareholders were actually distributions of equity to Husband, according to Mr. Dilley. It was "booked" as a loan to avoid the Hall Income Tax. This is in addition to the income paid to Husband during this time period. Additionally, as found by the Special Master, Husband had received loans to shareholders from all his businesses in the total amount of $7,075,380.00 from 2014 to 2018. Or an average of $1.4 million a year. In accordance with the testimony of Mr. Dilley, the Court find that Husband's average income is $1.4 million a year.

Inasmuch as this case was tried by the trial court sitting without a jury, we review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Hyneman v. Hyneman*, 152 S.W.3d 549, 553 (Tenn. Ct. App. 2003). Following our review of the record and the evidence presented, we conclude that the evidence does not preponderate against the trial court's determination that Husband had an average annual income of $1,400,000.00.

### 9. Debt on the Broadway Property

Husband contends that the trial court erred by failing to classify the debt associated with the Broadway Property as marital. Husband purchased the Broadway Property during the pendency of the first appeal and paid for it in part by selling another parcel of marital property despite a court order instructing him not to do so. As a part of the special master's hearing, the parties stipulated that the Broadway Property should be classified as marital property. By reason of this stipulation, the trial court included the $1,011,950.00 value of the Broadway Property in the marital estate; however, the trial court declined Husband's request to include $1,829,860.00 in debt encumbering the property in the marital estate.

As our Supreme Court has clarified, "marital debts" are "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003).[3] Here, Husband incurred the debt on the Broadway Property after the property's purchase on February 28, 2018. By 2018, however, the parties had already been declared divorced such that the debt on the Broadway Property was not incurred during the course of the marriage. Therefore, the $1,829,860.00 debt on the Broadway Property does not meet the definition of marital debt set forth in *Alford*. *See id.*

Moreover, as the trial court found, the loans associated with the property were taken out by 2108 E. Broadway LLC; however, Husband had presented no proof concerning this company, "its ownership, income, assets, or value." As such, the trial court declined to include the debt of this LLC in the valuation and distribution of the marital estate because the LLC itself was not included in the marital estate. In addition, the court noted that the loans had been obtained following a court order directing that Husband would not further encumber marital assets.

---

[3] Tennessee Code Annotated § 36-4-121(b)(1) has since been amended to include the following definition:

   (1)    "Marital debt":

           (A)    Means all debt incurred by either or both spouses during the course of the marriage through the date of the final hearing and any proceedings brought pursuant to Rule 59 of the Tennessee Rules of Civil Procedure; and

           (B)    Includes debt incurred to pay attorney fees and expenses incurred in connection with the proceedings, and unpaid attorney fees and expenses incurred in connection with the proceedings through the date of the final hearing and any proceedings brought pursuant to Rule 59 of the Tennessee Rules of Civil Procedure.

*See* 2022 Tenn. Pub. Acts, Ch. 762, § 4 (S.B. 2385) ), eff. Mar. 31, 2022.

Following our review, we determine that the evidence presented does not preponderate against the trial court's declination to classify the debt associated with the Broadway Property as marital. We therefore affirm the court's determination concerning this debt.

### 10. Additional Assets Purchased by Husband after Divorce

Husband asserts that the trial court erred by including assets in the marital estate that were purchased after the parties were declared divorced. Specifically, on July 21, 2017, Husband, acting through Trip's Nurseries, a marital business, purchased a new Range Rover vehicle for the parties' adult daughter to drive. The business purchased the Range Rover for $47,553.00, and the purchase price was the only evidence presented at trial as to the value of the vehicle. The trial court found that this Range Rover should be included in the marital estate as an asset of Trip's Nurseries. In addition, in June 2017, Husband co-signed a promissory note for the purchase of improved real property located on Nevada Avenue in Nashville ("the Nevada Avenue Property") for the benefit of the parties' adult daughter. The trial court found that Husband had made mortgage payments concerning this property in the amount of $35,063.90 from marital funds. The trial court credited the $35,063.90 amount to Husband, as a dissipation, in the division of the marital estate. Husband contends that these purchases occurred long after the parties were divorced and, as such, the assets failed to meet the definition of "marital property" pursuant to Tennessee Code Annotated § 36-4-121(b)(1)(A).

### A. New Range Rover

Husband takes issue with the trial court's decision to classify the Range Rover as marital property and include it in the marital estate. Husband argues that the Range Rover's purchase occurred long after the parties divorced and that Tennessee Code Annotated § 36-4-121(b)(1)(A) (2014) defined marital property as property "acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing."

The evidence in the record demonstrated that this Range Rover was purchased by Trip's Nurseries, a marital business, in July 2017. The marital business acquired the Range Rover before the trial court's ultimate division of the marital estate. The trial court found the Range Rover to be an asset of Trip's Nurseries, which resulted in the inclusion of the Range Rover's value in the value of that marital business entity. As an asset of Trip's Nurseries, the Range Rover should not have been separately listed as personal property on the trial court's balance sheet. We accordingly modify the trial court's award of marital property to Husband by subtracting the $47,553.99 value of the Range Rover, determining that it has already been accounted for as an asset of Trip's Nurseries, which was also awarded to Husband.

- 28 -

## B. The Nevada Avenue Property

Husband argues that the trial court erred by awarding to him the amount of $35,063.90 in the division of the marital estate, based on his use of marital funds to make mortgage and tax payments on the Nevada Avenue Property for the benefit of the parties' adult daughter. As previously explained, this Court must determine whether the trial court abused its discretion in crediting Husband with the $35,063.90 in its division of the marital estate. *See Owens*, 241 S.W.3d at 490. "An abuse of discretion occurs when the trial court . . . app[lies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

Tennessee Code Annotated § 36-4-121(c)(5)(A) provides that a trial court's division of marital property should consider "[t]he contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property." As such, the trial court has the discretion, in fashioning its equitable division of the marital estate, to consider whether a party utilized marital assets prior to the division of the marital estate in a manner that did not benefit the marital estate. Following our review of the evidence in the record, we determine that the trial court did not abuse its discretion by crediting Husband with $35,063.90 in dissipated funds based on the factors laid out in Tennessee Code Annotated § 34-6-121(c).

## C. 2011 Range Rover

Finally, Husband contends that the trial court erred by including a 2011 Range Rover in both his distribution of marital property and Wife's list of separate property. Wife does not address this contention in her appellate brief, and we agree that including the same asset in two separate portions of the balance sheet would be inappropriate. We therefore remove the value of this asset from Husband's share of the marital estate, allowing it to remain as Wife's separate property based on Husband's argument on appeal that it should not have been included in the marital estate.

Following our modification of the trial court's overall marital property distribution to remove the $47,553.99 value of the Range Rover owned by Trip's Nurseries and the $12,000.00 value of the 2011 Range Rover from Husband's share of the marital estate, we conclude that no further adjustment to the marital property division is necessary. Removal of these items of relatively insignificant value from Husband's share of the marital estate does not alter the fact that Husband has received a greater share of the marital estate than the trial court originally intended due to the court's overvaluing Wife's share by inadvertently omitting $2,000,000.00 in debt from Wife's portion. We therefore conclude

that a modification of the trial court's judgment to exclude these items from Husband's share need not result in a redistribution of the marital estate.

### 11. Propriety of the Trial Court's Overall Division of Marital Property

Husband's overarching postulate is that an accumulation of alleged errors by the trial court resulted in a marital property division that was inequitable and should be vacated and remanded for reconsideration. Having found no reversible error, however, and considering the overall property distribution in light of the statutory factors, we disagree.

As this Court has explained, "[t]he approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented." *Owens*, 241 S.W.3d at 490. A trial court has broad discretion in creating an equitable division of marital property, and appellate courts must give great weight to the trial court's division of the marital estate. *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2005).

Tennessee Code Annotated § 36-4-121(c) directs trial courts to consider certain relevant, but not all encompassing, factors when fashioning an equitable division of marital property. The version of the statute in effect when the instant action was initiated provided the following factors:

(1)     The duration of the marriage;

(2)     The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3)     The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4)     The relative ability of each party for future acquisitions of capital assets and income;

(5)(A)  The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B)     For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for

equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6)     The value of the separate property of each party;

(7)     The estate of each party at the time of the marriage;

(8)     The economic circumstances of each party at the time the division of property is to become effective;

(9)     The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10)    The amount of social security benefits available to each spouse; and

(11)    Such other factors as are necessary to consider the equities between the parties.

In its January 2021 order, the trial court analyzed all of the above-listed factors and made factual findings concerning each one. Notably, the trial court placed emphasis on other necessary factors to consider, stating:

> First, the Court considers Husband's repeated inability and simple refusal to abide by this Court's orders. Examples of this include, but are not limited to: (1) Husband taking out Paycheck Protection Loans against the marital businesses within days of this Court denying Husband's motion requesting to do so; (2) Husband borrowing against the marital estate despite explicit orders not to do so; and (3) Husband traveling overseas without informing Wife despite a clear order from the Court not to do so. The Court does not consider this issue in an effort to punish Husband for his poor behavior. Instead, the Court considers it due to the Court's concern that Husband will disregard this Court's orders related to the division of property in an effort to defeat Wife's receipt of marital assets.

> Second, the Court considers the proven efforts of Husband to hide assets. This includes efforts during the original litigation and trial, and continued acts in this regard during remand. It includes, but is not limited to, Husband's actions with regard to the property purchased by 1871, LLC, the overlooked parcels in the Cayman Islands, and Husband's forgotten purchase of the Piper properties. The Court does not consider this issue in an effort to punish Husband for his poor behavior. Instead, the Court

- 31 -

considers this factor as it relates to Husband's potential for taking action to defeat this Court's division of the marital estate.

We determine the trial court's factual findings concerning all relevant factors to be supported by a preponderance of the evidence. The trial court found that as to a majority of the pertinent § 36-4-121(c) factors, the evidence weighed in favor of awarding a greater portion of the marital estate to Wife, and we agree. Upon review of the record, this Court finds sufficient evidence that the trial court's equitable distribution, as modified herein, was consistent with the statutory factors contained in Tennessee Code Annotated § 36-4-121(c).

Husband argues that this Court should vacate and remand the property division to the trial court with an instruction that Husband should be awarded the marital real properties and Wife should receive additional alimony *in solido*, purportedly because Husband's ability to manage the properties is much greater than Wife's. We reiterate, however, that an equitable division of marital property pursuant to Tennessee Code Annotated § 36-4-121(c) is subject to the broad discretion of the trial court. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). This Court will not overturn the trial court's decision unless it "is inconsistent with the statutory factors or lacks proper evidentiary support." *Trezevant I*, 568 S.W.3d at 607 (citing *Baggett v Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)). Neither of those conditions exists here.

The trial court carefully and thoroughly considered the enumerated statutory factors and other relevant factors when allocating to Wife several real properties. The trial court stated its reasoning that allocating several real properties to Wife would provide her the opportunity to "grow her skills and relationships so as to be somewhat profitable in this business should she desire, as she states she does." In addition, the trial court articulated a desire to provide Wife with the ability to earn income and preserve her assets by awarding her income-generating real properties. The trial court also expressed concerns about Husband's potential "refusal to timely and appropriately pay the alimony *in solido* in exchange for marital property as ordered."

Predicated on our review of the evidence presented, we conclude that the trial court articulated legitimate reasons for allocating several real properties to Wife, and we find unpersuasive Husband's argument that he would be more qualified to manage those properties. Moreover, we determine that the trial court did not abuse its discretion in fashioning its equitable distribution of the marital estate, and we decline to vacate the trial court's distribution.

V. Wife's Attorney's Fees Incurred at the Trial Court Level

As the trial court noted, the parties in the "Agreed Order Resolving Certain Issues for Final Hearing, Limiting Others, and Addressing Other Matters," entered on July 1,

2020, agreed that Wife would not seek any form of alimony. However, the parties did reserve the issue of alimony *in solido* in order to adjust the distribution of the marital estate, address any dissipation, and provide for a potential award of attorney's fees. In its final order, the trial court concluded that each party would be able to pay his or her own attorney's fees from the party's respective portion of the marital estate, and the court declined to award attorney's fees to either party.

On appeal, Wife has requested that this Court reverse the trial court's denial of her request for an award of attorney's fees incurred at the trial court level. As our Supreme Court has elucidated:

> It is well settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn. Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). The decision whether to award attorney's fees is within the sound discretion of the trial court. *Crabtree v. Crabtree*, 16 S.W.3d 356, 361 (Tenn. 2000); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski*, 350 S.W.3d at 113.

In *Gonsewski*, the Court found that an award of attorney's fees was unwarranted, stating:

> Wife had been steadily employed for more than 16 years with the same employer, was earning an annual salary of at least $72,000, and was working in the field of information technology. Moreover, she had a college education, received more of the marital estate than Husband and, as far as this record shows, is physically and mentally healthy. The record contains

nothing to suggest that Wife was unable to secure counsel, either at trial or on appeal, but for an award of attorney's fees.

*Id.*

In the case at bar, Wife has a separate estate worth $2,578,112.81, and the trial court awarded to Wife $6,080,468.97 from the marital estate, constituting roughly 51% of the total marital estate, including an award of $5,000,000.00 in alimony *in solido*. In addition, the trial court specifically awarded to Wife certain income-producing real properties, reasoning that those properties would provide Wife with the highest possibility to earn continuing income with minimal effort. In view of these circumstances, we conclude that the trial court's denial of Wife's request for attorney's fees was well within its discretion.

## VI. Wife's Attorney's Fees on Appeal

Wife also requests that this Court award her attorney's fees incurred in defending against this appeal. "Whether to award attorney's fees on appeal is a matter within the sole discretion of this Court." *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). To determine whether an award of fees is appropriate on appeal, we take into consideration "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Id.*

Although we acknowledge that Wife has been successful in defending against this appeal, we also acknowledge Wife's ability to pay attorney's fees from her assets. Accordingly, we decline to award attorney's fees to Wife on appeal.

## VII. Conclusion

For the reasons stated above, the decision of the trial court is affirmed with the aforementioned modifications, with the result that Husband's share of the marital estate, as delineated in the trial court's balance sheet and judgment, will be reduced by $59,553.99. We decline to award attorney's fees to Wife on appeal. We remand this matter to the trial court for enforcement of its judgment equitably dividing the parties' marital estate. Costs on appeal are assessed to the appellant, Stanley H. Trezevant, III.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE